# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

LAVONNE DAMPIER,

        Plaintiff,

vs.                                                    CASE NO: 2:06-CV-121-JES-SPC

JOANNE BARNHART,
Commissioner of Social Security,

        Defendant.

_____

## REPORT AND RECOMMENDATION[1]

This matter comes before the Court on the Plaintiff Lavonne Dampier's Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on March 9, 2006.   The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #19) on October 19, 2006.   The Commissioner filed her Memorandum of Law in Support of the Commissioner's Decision (Doc. #20) on November 20, 2006. Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

## FACTS

### Procedural History

The Plaintiff previously filed an application for disability benefits on April 1, 2001, with an

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

alleged onset disability date of February 15, 2001.  (Tr. 11).  That claim was initially denied on May

8, 2001. (Tr.11).  The Plaintiff did not further pursue the claim, therefore, the prior determination was

final and binding.  (Tr. 11).

The Plaintiff then filed applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI) on April 30, 2002.  (Tr. 11).  These applications were denied initially on

August 20, 2002 and upon reconsideration October 29, 2002.  (Tr. 24-27, 28-31).  The Plaintiff

timely filed a request for hearing on November 26, 2002.  (Tr. 11, 43).  The Plaintiff appeared and

testified at a hearing on May 20, 2004, before the Honorable J. Richard Stables, Administrative Law

Judge.  (Tr. 11).  On July 30, 2004, the ALJ issued an unfavorable decision.  (Tr. 21).  The Plaintiff

timely filed a request for review by the Appeals Council.  The Appeals Council denied the Plaintiff's

request on January 12, 2006, making the ALJ's decision the final decision of the Commissioner.  (Tr.

4-6).  Pursuant to 42 U.S.C.§ 405(g), the Plaintiff now seeks judicial review of the Commissioner's

final decision.

## *Plaintiff's History*

The Plaintiff was born on August 4, 1941, making the Plaintiff sixty-two (62) at the time of

the hearing.  (Tr. 11, 61).  The Plaintiff has an eleventh grade education and past work experience

as a secretary and bookkeeper.  (Tr. 11-12).  The Plaintiff alleges an onset disability date of February

15, 2001, due to rheumatoid arthritis, constant back pain, inability to sit for very long, and difficulty

getting up after sitting for a long period of time.  (Tr. 12).

## *Medical and Psychological History*

On December 10, 1998, the Plaintiff presented to the Lee Memorial Health System with a

chief complaint of left shoulder pain.  (Tr. 110).  The Plaintiff stated that she woke up with severe

2

pain that got better but worsened since.  (Tr. 111).  X-rays revealed minimal degenerative changes.  (Tr. 111).  The Plaintiff was diagnosed with rheumatoid arthritis and was referred to physical therapy.  (Tr. 111, 114).  The Plaintiff underwent four (4) weeks of physical therapy.  (Tr. 114-116).  Long term goals were not met due to persistent inflammation.  (Tr. 113).  The Plaintiff was to see a rheumatologist.  (Tr. 113).  The Plaintiff's discharge diagnosis showed fair progress, but slowed by inflammation.  (Tr. 113).

The Plaintiff presented to Dr. Jodi Grosflam on February 25, 1999.  (Tr. 164-165).  Upon physical examination, the Plaintiff showed marked synovitis over MCP's, PIP's and wrists.  (Tr. 164).  The right elbow had flexion contracture of 10 degrees, the left elbow moved well, the right shoulder had moderately decreased internal rotation and moved well.  (Tr. 164).  The Plaintiff had normal straight leg raising, hips, knees, and ankles.  (Tr. 164).  Her feet did have marked MTP squeeze tenderness with good strength, normal reflexes, downgoing toes.  (Tr. 164).  Dr. Grosflam noted that the Plaintiff's development of symptoms of rheumatoid arthritis began in 1996.  (Tr. 163).  The Plaintiff was previously treated by Dr. A. Joseph Piccola with Relafen and then Daypro and referred to Dr. Richman.  (Tr. 163).  She was treated with prednisone, sulfasalazine and corticosteroid injection. (Tr. 163).  The Plaintiff stated that by June 1998, she was off the sulfasalazine due to side effects and began having trouble getting out of the van.  (Tr. 163).  By October, Dr. Piccola started her on Arthrotec which she felt 50 % improved but still had pain, discomfort and difficulty getting in and out of a van.  (Tr. 163).  Dr. Grosflam opined that the Plaintiff needed a disease modifying agent.  (Tr. 164).  The Plaintiff was prescribed Celebrex and to follow up in six weeks for a second line agent once her response to Celebrex was established.  (Tr. 164).

On April 19, 1999, the Plaintiff returned to Dr. Grosflam.  (Tr. 162).  The Plaintiff stated she

wasn't doing very well, still has a lot of pain and stiffness, and only achieved 30% improvement on Celebrex. (Tr. 162). Dr. Grosflam discussed disease modifying agents. (Tr. 162). The Plaintiff was interested in methotrexate and was prescribed 7.5 mg per week. (Tr. 162). The Plaintiff was to follow up in five (5) weeks. (Tr. 162).

On May 17, 1999, the Plaintiff returned to Dr. Grosflam for follow up. (Tr. 161). The Plaintiff stated that the methotrexate seemed to work with no side effects. (Tr. 161). Dr. Grosflam increased the methotrexate to 4 per week. (Tr. 161). The Plaintiff was to follow up in two (2) months. (Tr. 161).

On November 17, 1999, the Plaintiff returned to Dr. Grosflam stating that she was doing very well and that her medication has worked. (Tr. 16). Lab tests showed no toxicity. (Tr. 160). The Plaintiff showed mild hypercholesterolemia and hyperglycemia with mild thyroid difficulties. (Tr. 160). The Plaintiff was to follow up with Dr. Piccola on this and then with Dr. Grosflam in another two (2) months. (Tr. 160).

On February 21, 2000, the Plaintiff reported a decline from three (3) months ago with a bit more aching in her hands, knees and feet. (Tr. 159). Dr. Grosflam increased the methotrexate to 5 per week and continue on the same regimen. (Tr. 159). The Plaintiff was to follow up in two (2) months for evaluation and lab tests. (Tr. 159).

On July 13, 2000, the Plaintiff reported doing very well. (Tr. 158). The Plaintiff noted her arthritis was doing well. (Tr. 158). The Plaintiff was to skip one (1) week of methotrexate and double up on folic acid. (Tr. 158). Dr. Grosflam was to check her thyroid before addressing the Plaintiff's complaint of difficulty sleeping. (Tr. 158).

On December 5, 2000, the Plaintiff returned to Dr. Grosflam stating that she has been doing

4

quite well.  (Tr. 157).  Blood work completed recently showed no abnormalities.  (Tr. 157).  Dr. Grosflam suggested continuing on the current regimen.  (Tr. 157).  The Plaintiff was to follow up in three (3) months.  (Tr. 157).  The Plaintiff continued to report doing well with her rhematic medications.  (Tr. 156).  On December 6, 2001, the Plaintiff stopped her methotrexate and did not have a flare up of her disease.  (Tr. 155).  The Plaintiff went off the Celebrex for a while because she believed it decreased her concentration.  (Tr. 155).  The arthritis flared up and she started taking Celebrex again.  (Tr. 155).  Overall she felt good on the Celebrex but wondered if there was something else she should take or whether she is hurting herself by not taking anything stronger even though her arthritis feels well. (Tr. 155).  Dr. Grosflam suggested that she could take ibuprofen, Aleve, or Advil on a p.r.n. basis instead of the Celebrex unless her symptoms flared up.  (Tr. 155).  Dr. Grosflam's impression was that the rheumatoid arthritis was in remission and under excellent control.  (Tr. 155).

On March 26, 2002, the Plaintiff continued to report doing extremely well using ibuprofen. (Tr. 154).  The Plaintiff complained of having a bit more pain in her back on the lower right side when she tried to walk in the morning.  (Tr. 154).  Dr. Grosflam opined that it was probably degenerative joint disease (DJD) in her back, mild rheumatoid arthritis and suggested trying Flexeril 10 mg and continue on ibuprofen.  (Tr. 154).  Due to back pain, she underwent x-rays on April 15, 2002, which revealed a slight straightening of the usual lumbar lordosis and mild degenerative changes at L2-3. (Tr. 153).

On July 23, 2002, the Plaintiff underwent a consultative examination with Dr. Dareld R. Morris, II, at the request of the Social Security Administration.  (Tr. 183-185).  The Plaintiff complained of pain in "every joint in my body" secondary to an apparent diagnosis of rheumatoid

arthritis for "years". (Tr. 183). The Plaintiff complained of trouble sitting and standing, or arising from a sitting position. (Tr. 183). Upon physical examination, the Plaintiff's vision, heart, lungs, and abdomen evaluations were normal. (Tr. 183). The Plaintiff wore glasses to the examination, although no abnormalities were noted on pinhole or fundi examination. (Tr. 183). The Plaintiff's peripheral pulses were palpable and equal in all four extremities. (Tr. 183). The deep tendon reflexes were +2/4 in the upper and lower extremities, bilaterally. The Plaintiff's grip strength was 30 on the right and 20 on the left. (Tr. 183). Pinch testing showed 9 on the right, 10 on the left. (Tr. 183). No asymmetry or atrophy were noted in the extremities. (Tr. 184). Cervical Odonahue's and cervical compression tests were unremarkable. (Tr. 184). Scapular approximation test was positive for pain reproduction. (Tr. 184). Straight leg raising was unremarkable. Graenslen's test was positive, bilaterally. (Tr. 184). No trigger points or musculoskeletal spasms were noted, however, there was decreased range of motion. (Tr. 184). Neurologically, the Plaintiff's cranial nerves II-XII were grossly intact. Romberg's and Brudzinski's tests were unremarkable. The Plaintiff performed heel-toe and squat maneuver with some difficulty. (Tr. 184). No gross motor deficit or sensory deficit was noted. (Tr. 184). Dr. Morris' impression was hypothyroidism, diabetes mellitus II, and rheumatoid arthritis. (Tr. 184).

Dr. Morris opined that the Plaintiff had a decreased range of motion in all major joints, with some pain complaint upon the passive motion testing. (Tr. 184). Dr. Morris stated that the findings related to the spine show some objective findings to meet the subjective complaint, particularly the Graenslen's test and scapular approximation test.   (Tr. 184). The Plaintiff ambulates without assistance and without difficulty. (Tr. 184). The Plaintiff's grip strength and fine manipulation abilities are markedly decreased, as noted with the pinch and grip findings and range of motion

findings on this examination. (Tr. 184). The Plaintiff's thyroid disease was controlled with Synthroid. (Tr. 184). Her diabetes was controlled with oral Glucotrol, and stated rheumatoid arthritis diagnosis was controlled with ibuprofen. (Tr. 184). Ability to relate to Dr. Morris and staff was unimpaired, her ability to ambulate without assistance, to sit, stand, and repeatedly carry objects under twenty (20) pounds, and perform activities associated with memory and concentration, appear to be unimpaired. (Tr. 184). Dr. Morris stated that there are objective findings to meet her subjective complaint of joint pain and ability to rise from a sitting position due to pain in her hips and knees. (Tr. 184).

In a report dated August 19, 2002, B. Perry, a Medical Disability Adjudicator, documented a telephone conversation with Dr. Morris. (Tr. 195). Dr. Morris relayed that the Plaintiff's grip testing and pinch testing were performed with a dinomometer. There is a normal percentile for both. (Tr. 195). Right grip testing equals top 30%. (Tr. 195). Left grip testing equals 20%. (Tr. 195). Essentially, it meant it was 80% of normal. (Tr. 195). Pinch testing was 9 on the right (above 50%) and 10 on the left (top 10%). (Tr. 195).

On June 1, 2001, the Plaintiff presented to Dr. Marilyn Kole. (Tr. 151). Dr. Kole's initial assessment was hypertension, diabetes, rheumatoid arthritis, postmenopausal, and hypothyroid. (Tr. 152). The Plaintiff underwent an x-ray on September 10, 2001, for complaints of right ankle pain. (Tr. 149). X-ray results showed some mild spurring present about the ankle and probably a small cyst however, because of the Plaintiff history of trauma, the Dr. could not rule out a possible small avulsion type injury. (Tr. 14, 149).

In December 2001, the Plaintiff presented with complaints of feeling weird, back pain and fatigue. (Tr. 14, 147). The Plaintiff has a diagnosis of diabetes mellitus Type II not controlled,

rheumatoid arthritis, hypertension and memory difficulty.  (Tr. 14).   On December 20, 2001, a Cardiac Doppler Study was performed and demonstrated normal valvular velocities with no evidence of valvular stenosis.  (Tr. 145).   There was mild aortic and mitral insufficiency.  (Tr. 14, 145).   An Echocardiogram revealed normal left atrium and left ventricle, mild aortic valve sclerosis and an estimated left ventricular ejection fraction of 55%.  (Tr. 14, 145).

On January 8, 2002, a myocardial perfusion study was performed.  (Tr. 14, 139).   The study revealed there was no evidence of exercise induced myocardial isochemia or of any prior myocardial infarction.  (Tr. 14, 139).   A normal resting left ventricular function showed a normal wall motion with a normal left ventricular ejection fraction of 67%.  (Tr. 140).

On April 16, 2002, the Plaintiff underwent an x-ray for a history of thickening at the sternal notch and constant cough.  (Tr. 137).   Results showed no acute cardiovascular or pulmonary pathology.  (Tr. 137).   Osseous structures are normal with the exception of a slight right cervical and left upper dorsal scoliotic curve.  (Tr. 135, 137).

On November 7, 2002, the Plaintiff returned to Dr. Kole for a follow up examination.  (Tr. 234-235).   The Plaintiff weighed 172 pounds.  (Tr. 233).   The Plaintiff stated she was trying to diet, but was not doing well with any diet.  (Tr. 233).   Physical examination showed no thyroid enlargement, tenderness, or mass. (Tr. 234). Respiratory examination showed no recent upper respiratory infection, dyspnea, cough, hemoptysis or wheezing.  (Tr. 233).   Her lungs were clear to auscultation and percussion with normal respiratory effort and no fremitus.  (Tr. 234).   Cardiac examination was normal. (Tr. 233).  Psychiatric assessment showed no increased nervousness, mood changes or depression, and the Plaintiff was coping well. (Tr. 233).   The neck and thyroid appeared symmetrical with no elevation of the jugular venous pulsation, no thyroid enlargement, tenderness

or mass.  (Tr. 233).  Dr. Kole's assessment was iatrogenic hypothyroidism, Type II non-insulin dependent diabetes, cough and climacteric arthritis.  (Tr. 234). The Plaintiff was instructed to return in three (3) weeks.  (Tr. 235).

On January 27, 2003, the Plaintiff returned to Dr. Kole for a follow up evaluation.  (Tr. 224). The Plaintiff appeared healthy and in no distress.  (Tr. 224).  Physical examination appeared unchanged.  (Tr. 224).  Dr. Kole noted no muscle or joint pain, weakness, swelling or inflammation, no restriction of motion, no atrophy or backache.  (Tr. 224).  Dr. Kole's assessment was that the Plaintiff's istrogenic hypothyroidism and Type II diabetes were unchanged, however the Plaintiff's cough was improved.  (Tr. 225).  Dr. Kole recommended a strict diet and the Plaintiff was to return in four (4) months.  (Tr. 225).

On December 11, 2003, the Plaintiff returned to Dr. Kole for a follow up evaluation.  (Tr. 212-213).  Physical examination showed the Plaintiff appeared healthy with no distress.  (Tr. 212). The Plaintiff weighed 165 lbs.  (Tr. 212).  The neck and thyroid was symmetrical with no elevation of the jugular venous pulsation.  (Tr. 212).  There was no thyroid enlargement, tenderness or mass. (Tr. 212).  Cardiac examination showed regular rhythm, no murmurs, rubs, or gallops.  PMI was not displaced.  (Tr. 212).  There was no edema or varicosities.  (Tr. 212). The Plaintiff had normal gait, no clubbing cyanosis, inflammation or ischemia.  (Tr. 213).  Dr. Kole opined that the Plaintiff's iatrogenic hypothyroidism and non-insulin dependent type II diabetes was improved.  (Tr. 213).  Dr. Kole recommended regular medical screenings, no change in medication, vitamin D and exercise and to return in four (4) months.  (Tr. 213).

<u>*Administrative Law Judge's Decision*</u>

Upon consideration of the record, the ALJ found that the Plaintiff meets the non-disability

requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision. (Tr. 20). The ALJ found that the Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. (Tr. 20). The ALJ found that the Plaintiff's rheumatoid arthritis and lumbar spine impairments described in the decision are "severe" based on the requirements in the Regulations. (Tr. 21). However, the ALJ found that these medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 21). The ALJ concluded that the Plaintiff's allegations regarding her limitations are generally credible. (Tr. 21). The ALJ determined that the Plaintiff has the residual functional capacity to perform light exertional work activity with the specific limitations stated in the text of the decision. (Tr. 21). The ALJ found that the Plaintiff is unable to perform any of her past relevant work, was closely approaching retirement age and had limited education. (Tr. 21). The Plaintiff had transferable skills from skilled work previously performed. (Tr. 21). The ALJ determined that, based upon an exertional capacity for light work, and the Plaintiff's age, education and work experience, a finding of "not disabled" was supported by Medical-Vocational Rule 202.03 in conjunction with the vocational expert's testimony identifying jobs that the claimant can still perform which utilize the Plaintiff's transferable skills. (Tr. 21). Therefore, the ALJ concluded that the Plaintiff was not under a "disability" as defined in the Social Security Act. (Tr. 21).

## THE STANDARD OF REVIEW

### A. Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the

10

findings are supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct.

1420, 28 L. Ed 2d 842 (1971).  In evaluating whether a claimant is disabled, the ALJ must follow the

sequential inquiry described in the regulations[2].  See 20 C.F.R. §§ 404.1520(a), 404.920(a).  The

Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. §

405(g).  Substantial evidence is more than a scintilla-i.e., the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560

(11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402

U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court

will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the

reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v.

Sullivan, 937 F.2d 580, 585 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.3d 1356, 1458 (11th Cir.

---

[2]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:
Step 1.  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.
Step 2.  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.
Step 3.  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.
Step 4.  Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.
Step 5.  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

1991).  The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court  "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

## B.  Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).

To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984). (remand was appropriate to allow ALJ to explain the his basis of his decision).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding ALJ error and remanding to consider psychiatric evaluation); Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. Jackson, 99 F.3d at 1095.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the

failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. Jackson, 99 F.3d at 1090 - 92; Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994).  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.³ Id.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## DISCUSSION

The Plaintiff argues that the ALJ (1) failed to consider all of the Plaintiff's severe impairments;

---

³The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. Jackson, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. Id. In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. Id.

(2) failed to consider the Plaintiff's impairments in combination; (3) failed to properly analyze the Plaintiff's complaints of pain; (4) and failed in his determination at Step 5 of the Sequential Evaluation Process.   The Commissioner   argues that the ALJ's determination was based upon substantial evidence and should be affirmed.

### (1) Did the ALJ Fail To Consider All Of The Plaintiff's "Severe Impairments?"

The ALJ found that the Claimant's rheumatoid arthritis and lumbar spine impairments are "severe" based on the requirements in the Regulations.  (Tr. 21).  The Plaintiff argues the ALJ should have found that the Plaintiff also had a severe left shoulder impairment and severe uncontrolled diabetes mellitus.  The Commissioner asserts that these arguments are baseless.

To determine whether a claimant qualifies for Social Security disability benefits, the ALJ must follow a five step sequential evaluation process set forth by 20 C.F.R. 404.1520. Johnson v. Barnhart, 268 F. Supp.2d 1317, 1324 (11th Cir. 2002). If a determination as to the claimant's disability can be made at one stage, it is not necessary for the ALJ to move on to the next step in the evaluation. McCruter v. Bowen, 791 F.2d 1544, 1546 (11th Cir. 1986). At the second step, the ALJ is to consider the severity of the claimant's impairment, taking into account the duration of the impairment and impairments in combination. Here, the ALJ must decide whether the impairment imposes a limit on the claimant's physical or mental ability to participate in basic work activities. Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997).

A medically determinable impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520 and 416.920.  Plaintiff argues that she suffers from a severe left shoulder impingement that is affected by her rheumatoid arthritis.  Plaintiff alleges that he shoulder pain is a 9 on a scale of 10

15

to 10.  (Tr. 262-263).

Dr. Grosflam treated the Plaintiff for rheumatoid arthritis for the period February, 1999 to April, 2002.  (Tr. 13).   The Plaintiff was originally seen in 1999 for management of rheumatoid arthritis.  (Tr. 13).   Initial treatment involved the use of anti-inflammatory drugs with only minimal response. (Tr. 13).  By May 17, 1999, the Plaintiff was doing well on Methotrexate and subsequent office notes show that in July 2000 the Plaintiff was doing well and her lab work was unremarkable. (Tr. 13).  In December of 2001, the Plaintiff had good range of motion in her hands, wrists, elbows, shoulders, straight leg rasing, hips, knees, ankles and feet.  (Tr. 13).  She had stopped Methotrexate and did not have a flare-up of her disease. (Tr. 13).   Her rheumatoid arthritis was under excellent control and in remission.  (Tr. 13).  There were no other new complaints or problems.  She was doing well on Ibuprofen.  (Tr. 13).

The ALJ stated, "The medical evidence indicates that the Plaintiff has rheumatoid arthritis with some decreased grip and pinch strength; ... which is "severe" within the meaning of the Regulations but not severe enough to meet or medially equal... one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (Tr. 16).   He went on to add:

> **LISTING 14.09 Inflammatory Arthritis (including rheumatoid arthritis)** is not met or equaled because the evidence does not document that claimant's rheumatoid arthritis results in clinical inflamation of major joints causing difficulty with ambulation or fine and gross movements, or that the arthritis may; involve other joints or cause less restriction of ambulation or other movements and be complicated by extra-articular features that cumulatively result in serious functional deficit.

The ALJ went on to conclude the "evidence discussed above shows that claimant's rheumatoid arthritis has been under excellent control and in remission for an extended time. The claimant acknowledged that she does well on Ibuprofen." (Tr. 16).  Therefore, the Court

16

concludes the Plaintiff's argument regarding shoulder pain was properly analyzed by the ALJ and discounted as being a "severe" impairment which would affect her ability to participate in daily work activities.

Regarding the Plaintiff's claim of diabetes as a severe impairment, the ALJ concluded the Plaintiff's "diabetes appeared to be controlled with oral Glucotrol." (Tr. 13). Further her non-insulin dependent diabetes Type II showed improved status. (Tr. 15). Thus, ALJ determined that the Plaintiff had an ability to perform basic work activities.

There is no indication in the record or in the Plaintiff's argument which would substantiate how her diabetes impacted her ability to perform work activities. The record does indicate, however, that the Plaintiff says she can prepare simple meals, load the dishwasher, dust, vacuum, grocery shop with assistance, do laundry drive to the grocery store and hair salon 3 to 4 times weekly, attend church weekly, and visit with friends (Tr. 256-260). While the performance of everyday tasks cannot be used to make a determination that the Plaintiff was not disabled, daily activities can be used as a measure of the Plaintiff's credibility in regard to her ability to perform certain tasks. *See* Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited a treating physicians testimony by pointing out the contrasts in the claimants daily activities and the physicians diagnosis); Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987) (holding an evaluation of activities of daily living in disability determinations is appropriate). Therefore, the Court does not find the ALJ erred in his analysis that the Plaintiff's shoulder pain and diabetes mellitus were not "severe" based on the requirements in the Regulations.

17

*(2) Whether the ALJ Failed to Consider all of the Plaintiff's Medically Determinable Impairments in Combination or at Step 2 of His Evaluation*

As stated above, to determine whether a claimant qualifies for Social Security disability benefits, the ALJ must follow a five step sequential evaluation process set forth by 20 C.F.R. 404.1520. Johnson v. Barnhart, 268 F. Supp.2d 1317, 1324 (11th Cir. 2002). If a determination as to the claimant's disability can be made at one stage, it is not necessary for the ALJ to move on to the next step in the evaluation.  McCruter v. Bowen, 791 F.2d 1544, 1546 (11th Cir. 1986). At the second step, the ALJ is to consider the severity of the claimant's impairment, taking into account the duration of the impairment and impairments in combination. Here, the ALJ must decide whether the impairment imposes a limit on the claimant's physical or mental ability to participate in basic work activities. Crayton v.Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997).

Thus, if a claimant has more than one impairment, the Commissioner must review the impairments symptoms, signs, and laboratory findings to determine whether the combination of impairments is medically equal to any listed impairment. Wilson v. Barhhart, 284 F.3d 1219, 1224 (11th Cir. 2002). It is the ALJ's duty to make specific and well articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the Plaintiff to be impaired. Walker, 826 F. 2d at 1001.

The Plaintiff states the ALJ makes no mention of the Plantiff's shoulder pain and uncontrolled diabetes mellitus type II, in his analysis of what may effect the Plaintiff's ability to work and that the case should be remanded for failing to consider all of the Plaintiff's impairments.

Not only did the ALJ address the issues of should pain and diabetes mellitus type II, but also the conditions of cardiac impairment (Tr. 14), hypothyroidism (Tr. 15), depression (Tr. 15), and

18

disorder of the spine (Tr. 15). The ALJ concluded:

> The medical evidence indicates that the claimant has rheumatoid arthritis with some decreased grip and pinch strength; lumbar spine degenerative joint disease and mild spurs at L2-3 and slight lumbar straightening of the usual lordosis, impairments that are "severe" within the meaning of the Regulations but not severe enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No 4. (Tr. 16).

It is sufficient for the Court to determine that the ALJ did indeed consider all of the Plaintiff's medical impairments in combination, where the ALJ states that he considered the impairments in combination. Wilson, 284 F.3d at 1224-1225 (citing Jones v. Dept. of Health and Human Services, 941 F.2d 1529, 1533 (11th Cir. 1991) (holding that the following statement by an ALJ evidenced consideration of the combined effects of a claimant's impairments: "while [the claimant] has severe residuals of an injury to the left heel and multiple surgeries on that area [the claimant does not have] an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.").

Clearly, the ALJ's decision reflects that he reviewed all of the Plaintiff's impairments and considered them in combination along with the medical record and found them to be not severe. After review of the record and the ALJ's decision, the Court concludes that the ALJ made well articulated findings regarding the that Plaintiff's impairments and considered them in combination with all other impairments. Therefore, the Plaintiff's Motion to Remand for the ALJ's failure to consider all of the Plaintiff's impairments in combination should be denied.

### (3) Whether the ALJ Failed to Properly Analyze the Plaintiff's Complaints of Pain

The Plaintiff argues that the ALJ failed in properly analyzing the Plaintiff's subjective complaints including pain. The Commissioner argues that the ALJ gave proper consideration to the

Plaintiff's subjective complaints of pain and that the ALJ properly evaluated the Plaintiff's allegations of disabling pain in accordance with controlling Eleventh Circuit case law.

Pain is a non-exertional impairment. Id. at 1559. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g. medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard." Foote, 67 F.3d at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence. Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

In making his assessment, the ALJ indicated that he must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR § 404.1529, and Social Security Ruling 96-7p. The ALJ must also consider any medical opinions, which are

statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations (20 CFR § a404.1527 and Social Security Rulings 96-2p and 96-6p). (Tr. 17).

The Plaintiff testified at the hearing under oath that she has rheumatoid arthritis. She is able to get around but still has pain it affects her hips, knees, shoulders, and her ability to walk normally. She does not use a cane or crutches. On a scale of 1 to 10, the Plaintiff described her pain as a level 9. The ALJ points out that Dr. Morris completed a physical capacities evaluation and opined that the Plaintiff's ability to ambulate without assistance, to sit , stand, and repeatedly carry objects under 20 pounds is unimpaired. (Tr. 17). The Plaintiff stated that her rheumatoid arthritis is controlled with ibuprofen. (Tr. 17). The ALJ further states that the Plaintiff "testified that she has depression and trouble sleeping. She takes Tylenol P.M. at night. She also testified that she goes shopping, visits with friends, goes out to eat and attends church every Sunday." (Tr. 17). The ALJ points out that Dr. Morris opined that the Plaintiff's ability to relate to him and his staff was unimpaired. Claimant's ability to perform, activities associated with memory and concentration appeared to be unimpaired. (Tr. 17). The ALJ concluded that after considering the "claimant's own subjective allegations... and testimony and finds them generally credible in light of the objective medical evidence discussed earlier. However, the resulting functional limitations proven by the evidence are certainly not disabling."(Tr. 17); *See* Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because of her daily activities demonstrated otherwise). Therefore, the Court finds that the ALJ clearly articulated why the Plaintiff's subjective allegations of pain did not rise to the level of being disabling.

*(4) Whether the Commissioner Failed to Carry His Burden at Step Five of the*
*Sequential Evaluation Process*

The Plaintiff argues that the ALJ failed in step five of the evaluation process because there was a conflict in the testimony of the VE and that which is described in the Dictionary of Occupational Titles. The Plaintiff also argues that the ALJ applied the wrong standard under § 404.1653(d) when considering the Plaintiff's ability to work in that the ALJ failed to treat the Plaintiff as "closely approaching retirement age" and denied Plaintiff's disability benefits without a finding that she possessed "highly marketable" skills.

The Commissioner asserts that although there was some variance between jobs identified by the VE and the DOT, the ALJ properly evaluated the evidence. Further, the Commissioner argues that the ALJ posed a hypothetical to the VE which included age 62 and that he clearly considered the Plaintiff's advanced age when contemplating her ability to perform other work at step five of the sequential evaluation process.

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Id. at 1558; Allen v.Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. Foote, 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P,Appendix 2, § 200.00 (e); Foote, 67 F.3d at 1559 (citing

22

Heckler v. Campbell, 461 U.S. 458, 103 S.Ct. 1952, 76 L. Ed. 2d 66 (1983) (holding that exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." Walker v. Bowen, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Foote, 67 F.3d at 1559; MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986) (when nonexertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert). It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. Allen v. Sullivan, 880 F.2d 1200, 1202 (11th Cir. 1989). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. Foote, 67 F.3d at 1559.

In this case, the ALJ heard testimony from a Vocational Expert (VE).  The ALJ states: "The VE testified that a hypothetical individual with the same vocational profile and residual functional capacity as claimant's could not perform any of the claimant's past relevant work." (Tr. 18).  The ALJ found that the VE's testimony was justified and accepted it and further found that the Plaintiff could not perform any of her past relevant work.  (Tr. 18).

Once the Plaintiff established that she has no past relevant work or cannot perform her past

relevant work because of her impairments, the burden shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the Plaintiff can perform, consistent with her residual functional capacity, age, education, and work experience.

The Plaintiff's age, education, and vocationally relevant past work experience, if any, must be viewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the Plaintiff's residual functional capacity and vocational profile. The ALJ found:

> Born on August 4, 1941, the claimant is currently 62 years old. This is defined in the regulations as an individual closely approaching retirement age (20 CFR § 404.1563). She has a limited education but has transferable skills from the skilled work she previously performed. The claimant has acquired skills of working with office machines and computers, record keeping, and telephone and verbal and written communication. (Exhibit 7E/2). (Tr. P. 19).

Although the Plaintiff claims that the ALJ failed to consider the Plaintiffs advanced age when contemplating her ability to perform work at step five in the evaluation process, this argument is without merit. Clearly, the ALJ considered the Plaintiff's age of 62 as an individual closely approaching retirement age as well as her education, and transferable skills from the skilled work she previously performed.

An impartial VE may be used to help determine whether or not there are a significant number of jobs in the national economy that the Plaintiff can perform given her residual functional capacity and other vocational factors. Here, the ALJ asked the VE whether jobs exist in the national economy for an individual of the Plaintiff's age, education, past relevant work experience and residual functional capacity as determined. The VE testified that "assuming the hypothetical individual's

specific work restrictions, she is capable of making a vocational adjustment to other work." [4]   The VE also testified that the Plaintiff's acquired skills would be transferable to each of the jobs.(Tr. 19-20,107).

In the instant case, a discussion was held on the record with the VE regarding the DOT and whether or not his opinion was consistent with the DOT.    Although he first indicated that it was, (Tr. 272), during cross examination he had to clarify his answer.    Specifically, some of the jobs that he indicated the Plaintiff could do are listed in the DOT as jobs which would require more sitting than that which the Plaintiff could physically handle.   However, in the VE's opinion, the jobs that he identified as those the Plaintiff could perform, would require up to two hours of sitting and could mostly be done standing.   (Tr. 273-276).

The Eleventh Circuit has held that when the VE's testimony conflicts with the DOT, the VE's testimony "trumps" the DOT. Jones v. Apfel, 190 F.3d at 1224, 1229-1230 (11th Cir. 1999). The VE's testimony controls because the VE's task is to determine whether there are jobs in the region which the claimant can perform with his precise disabilities or limitations. Id. Therefore, an ALJ may rely on the VE's testimony even if it is inconsistent with the DOT. Id.

Regarding the testimony of the VE, the ALJ found that:

> The totality of the probative evidence in this case corroborates the validity of the hypothetical profile the undersigned submitted to the vocational expert, while matters raised in cross examination are inconsistent with the clear indications of the relevant evidence.   Thus, the vocational expert's testimony will be given significant weight, while his responses to the cross examination must be disregarded.  (Tr. 20)

The ALJ accepted the testimony of the VE and found the Plaintiff has transferable skills and that they

---

[4]The VE testified that given all of the factors the Plaintiff could work as a: Proof Operator, Tourist Information Assistant, Night Auditor, Ward Clerk, Animal Hospital Clerk, Reservation Clerk, Auto Rental Clerk, Gate Attendant, Parts Order Stock Clerk. (Tr. 19).

transfer to the jobs listed by the VE. (Tr. 20). The Court will not disturb this finding.

The Medical-Vocational Guidelines may be used to direct an unfavorable decision only if the claimant has the exertional residual functional capacity to perform substantially all (as defined in Social Security Ruling 83-11) of the seven primary strength demands required by work at the given level of exertion (as defined in Social Security Ruling 83-10) and there are no nonexertional limitations.   When all of the criteria of a Medical-Vocational Rule are met, the existence of occupations in the national economy is met by administrative notice.

The ALJ found that:

 [b]ecause the evidence suports a finding that the claimant can perform the demands of a significant range of light work, a finding of not disabled is supported by Medical-Vocational Rule 202.03 used in conjunction with the vocational expert's testimony identifying jobs that the claimant could perform, despite her age, education, past work history and residual functional capacity.

Based on the testimony of the vocational expert, the undersigned concludes that considering the claimant's age, educational background, work experience, and residual functional capacity, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy. (Tr. 20).

For those reasons, the ALJ concluded that the Plaintiff retains the capacity for work that exists in significant numbers in the national economy and is not under a "disability" as define in the Social Security Act, at any time through the date of the decision. (20 CFR § 404.1520(g)).  (Tr. 20). This Court does not find any reason to disturb the decision of the ALJ.

Accordingly it is hereby  **RESPECTFULLY RECOMMENDED**:

The Decision of the Commissioner should be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from

attacking the factual findings on appeal.

**DONE AND ORDERED** at Fort Myers, Florida, this   30th   day of January 2007.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: Counsel of Record

27